**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| ESTATE OF LAYTON P. STUART; | ) | |
| STUART FAMILY 1997 TRUSTS; | ) | |
| RICHARD A. TORTI, SR., AS | ) | |
| REPRESENTATIVE OF THE ESTATE | ) | |
| OF LAYTON P. STUART AND | ) | |
| TRUSTEE OF THE STUART FAMILY | ) | |
| 1997 TRUSTS; AND TOMMYE H. | ) | |
| STUART, HUNTER P. STUART, AND | ) | |
| KIRBY L. STUART, AS BENEFICIARIES | ) | |
| OF THE STUART FAMILY 1997 | ) | |
| TRUSTS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT OF THE UNITED STATES OF AMERICA**

## I.      INTRODUCTION

1.      This is an action under the False Claims Act, 31 U.S.C. §§ 3729–33

(FCA), and the common law, to recover treble damages and penalties arising from a fraud

on the United States Department of the Treasury (Treasury) and its Troubled Asset Relief

Program (TARP).

2.      Layton P. Stuart used his position as owner, president, and Chief

Executive Officer of One Financial Corporation (One Financial), and its wholly owned

subsidiary, One Bank & Trust, N.A. (the Bank), to commit the frauds detailed in this

complaint.

3.      For years before Treasury invested public funds in One Financial—and for years after—Stuart diverted tens of millions of dollars from the Bank for his personal use. Among the funds that Stuart diverted was over $2.1 million of Treasury's $17.3 million TARP investment in One Financial.  The investment was extended to stabilize the Bank following the financial crisis of 2008, but a significant portion personally benefitted Stuart, his family, and his conspirators, many of whom have since been indicted.[1]

4.      In this action, the Estate of Layton P. Stuart (the Estate) and the Stuart Family 1997 Trusts (the Trusts) stand in Stuart's shoes as his successors in interest,[2] and are referred to collectively as Defendants.  Richard A. Torti, Sr. is named as the representative of the Estate and the current trustee of the Trusts, and Tommye H. Stuart (Stuart's wife), Hunter P. Stuart (Stuart's adult son), and Kirby L. Stuart (Stuart's adult daughter), are named as the beneficiaries of the Trusts.

5.      As detailed with particularity below, Defendants on behalf of One Financial knowingly presented, or caused to be presented, false claims to Treasury to secure a $17.3 million investment of TARP funds; and knowingly made, used, or caused to be made or used, false records or statements material to those false claims, in violation

---

[1]      To date, five former One Financial directors and Bank executives have been criminally charged for their roles in the various frauds against the Bank, including former Chief Financial Officer Tom M. Whitehead, former Chief Operating Officer and One Financial Director Michael F. Heald, former Controller Matthew D. Sweet, former Executive Vice President and One Financial Director Gary A. Rickenbach, and former Executive Vice President Bradley S. Paul (together, the Senior Executives).  *See* Superseding Indictment, *United States v. Rickenback, Heald, Whitehead, & Paul*, No. 4:14-cr-00068-KGB (E.D. Ark. Mar. 3, 2015); Indictment, *United States v. Sweet*, No. 4:13-cr-00332-JLH (E.D. Ark. Nov. 6, 2013).

[2]      Stuart died on March 26, 2013.

of the FCA, 31 U.S.C. § 3729(a)(1)(A)–(C),[3] and the common law of fraud, payment by mistake, and unjust enrichment.

6.     Defendants initially requested a TARP investment of $10 million in an October 2008 application sent to Treasury in Washington, D.C.

7.     Defendants later increased that request to $17.3 million in a May 2009 email sent to Treasury in Washington, D.C.

8.     Defendants formally presented their claims for TARP funds to Treasury in a June 2009 Securities Purchase Agreement (SPA), signed by Stuart on behalf One Financial.

9.     In the TARP application, SPA, and financial reports that both referenced, Defendants knowingly made false statements about the financial condition of the Bank and intentions for the use of the TARP funds.  The statements and claims were materially false because they concealed the existence of Stuart's frauds, and the effect of those frauds on the financial condition of One Financial and the Bank.

10.     Relying on the veracity the statements and claims that Defendants made on behalf of One Financial, Treasury approved the $17.3 million TARP investment and countersigned the SPA in Washington, D.C., on June 5, 2009.  The same day, Treasury

---

[3]     The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), of May 20, 2009.  Given the claims at issue here, sections 3729(a)(1) and 3729(a)(3) of the prior statute, and sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C) of the current statute are applicable.  Sections 3729(a)(1) and 3729(a)(3) apply to conduct that occurred before FERA was enacted, and §§ 3729(a)(1)(A) and 3729(a)(1)(C) apply to conduct that occurred after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

wired $17.3 million to One Financial.  The money was deposited into a Bank checking account.

11.     But for Stuart's misrepresentations and omissions of material facts, Treasury would not have invested in One Financial.  Specifically, had Treasury known the true financial condition of the Bank, or that Stuart would immediately divert over $2.1 million of the TARP investment for his personal use and continue his ongoing fraud on the Bank in numerous other ways, Treasury would not have invested in One Financial. Accordingly, the United States is entitled to recover the entire amount of Treasury's $17.3 million investment plus treble damages and penalties.  31 U.S.C. § 3729(a)(1).

## II.     JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, and 1367 because this is a civil action by the United States that arises under the FCA and federal common law, and all claims in this action form part of the same case or controversy.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transacted business, and committed acts proscribed by the FCA, within this judicial district.  Specifically, Defendants on behalf of One Financial submitted the false claims, and statements material to those claims, to Treasury in Washington, D.C., and Defendants improperly induced Treasury to enter into the SPA memorializing Treasury's investment, which was countersigned in Washington, D.C. Furthermore, in the SPA, Defendants on behalf of One Financial consented "to submit to the exclusive jurisdiction and venue of the United States District Court for the District of

Columbia . . . for any and all civil actions, suits or proceedings," like this one, "arising out of or relating to" the SPA.  SPA § 7.5.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)–(c) and 31 U.S.C. § 3732(a) because a substantial part of the events or omissions giving rise to the claims at issue occurred within this judicial district, and Defendants transacted business, and committed acts proscribed by the FCA, within this judicial district.  In addition, many witnesses with information relevant to this matter reside or conduct business in Washington, D.C., and much of the evidence relevant to this matter is located in Washington, D.C.

## III.     THE PARTIES

15.     Plaintiff in this action is the United States of America suing on behalf of Treasury.  Treasury is headquartered in Washington, D.C., and its principal place of business is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

16.     Defendant Estate is the successor in interest to, and stands in the shoes of, Stuart, the former owner of One Financial and the Bank.  Before Stuart's death, he was the president and Chief Executive Officer of One Financial, and he owned 99.4 percent of One Financial's common stock.  He was also the president and Chief Executive Officer of One Bank, and the Chairman of its Board of Directors, until his termination by the Board of Directors in September 2012.  Stuart signed the TARP application and SPA for One Financial.

17.     Defendant Trusts were established by Stuart as trustor and Senior Executive Heald as trustee, nominally for the benefit of Stuart's wife, Tommye H. Stuart, son, Hunter P. Stuart, and daughter, Kirby L. Stuart, in Pulaski County, Arkansas.  Stuart

created the Trusts in August 1997, funding them with $30 in cash, followed by a $20

million insurance policy on his life issued by the John Hancock Life Insurance Company.

18.     Stuart disregarded the formalities of the Trusts from their inception and

used them to divert Bank funds for his personal use. Accordingly, the Trusts are alter

egos of Stuart and the Estate, and the assets of the Trusts are assets of the Estate.

19.     The day the Trusts were created, the Bank (represented by Senior

Executive Heald) and the Trusts (also represented by Senior Executive Heald) executed a

"Split Dollar Life Insurance Agreement" (the Split Dollar Agreement), under which the

Bank agreed to pay the policy's $350,000 annual premiums on the understanding that the

premiums would be repaid upon Stuart's death. The arrangement was facilitated by a

collateral assignment of the policy to the Bank.

20.     Both the agreement establishing the Trusts (the Trust Agreement), and the

Split Dollar Agreement, imposed formalities on the Trusts that limited the actions that

Stuart, the trustor, could take. The Trust Agreement limited withdrawals to $10,000

annually for each of the three beneficiaries, did not provide for distributions to Stuart, and

directed that a new trustee could be appointed only by the current trustee or a majority of

the beneficiaries. The Split Dollar Agreement prohibited loans against the cash value of

the policy, which was to "remain available . . . to satisfy the amount payable to the Bank"

upon Stuart's death or the termination of the agreement." The Split Dollar Agreement

also required Senior Executive Heald to notify John Hancock of its terms, including the

collateral assignment to the Bank.

21.     Stuart and the trustees—initially Senior Executive Heald, then others

handpicked by Stuart—consistently disregarded these formalities. First, Senior

Executive Heald never notified John Hancock of the Split Dollar Agreement, facilitating Stuart's subsequent misuse of the cash value of the policy.

22.    Second, between 1998 and 2001, Stuart misappropriated approximately $568,000 of the cash value that had been created by the Bank's premium payments. Senior Executive Heald, as trustee, began making annual withdrawals as soon as the policy permitted, and the money was deposited into Stuart's personal accounts.  The withdrawals exceeded the annual limit in the Trust Agreement, and, as distributions to Stuart, were not authorized by the Trust Agreement.

23.    Third, in 2011, Stuart fraudulently obtained a $1.7 million loan against the policy that was never repaid.  Stuart persuaded a successor trustee of the Trusts to facilitate the $1.7 million loan, which was issued by a check to the "Stuart Family Trusts," but delivered to Stuart's office.  Through the current trustee, the Trusts have acknowledged that "the check was endorsed by Stuart and utilized by him for purposes unrelated to the Trusts, inconsistent with the purpose of the Trusts, and in derogation of . . . the rights and expectations of the Trusts and the Beneficiaries."  First Amended Complaint ¶ 19, *Torti v. Hoag*, No. 4:14-cv-330 (E.D. Ark.), ECF No. 14.

24.    Finally, Stuart directed or exerted undue influence over the process for appointing successor trustees in violation of the Trust Agreement.

25.    Richard A. Torti, Sr. is the current trustee of the Trusts and the representative and executor of the Estate.  He became the trustee of the Trusts on or about March 1, 2013.  On information and belief, he currently resides in Pulaski County, Arkansas.

26.     Tommye H. Stuart is the widow of Layton P. Stuart and a beneficiary of the Trusts.  On information and belief, she currently resides in Miramar Beach, Florida.

27.     Hunter P. Stuart, now 33-year-old, is the son of Layton P. Stuart and a beneficiary of the Trusts.  On information and belief, he currently resides in Little Rock, Arkansas.

28.     Kirby L. Stuart, now 31-year-old, is the daughter of Layton P. Stuart and a beneficiary of the Trusts.  On information and belief, she currently resides in Dallas, Texas.

## IV.     STATUTORY AND REGULATORY FRAMEWORK

### A.     The False Claims Act

29.     The FCA provides that any person or entity that individually, or in concert with others, knowingly presents, or causes to be presented, a false claim for payment or approval, or a false statement that is material to a claim for payment or approval, is liable to the United States for penalties and treble damages.  *See* 31 U.S.C. §§ 3729(a)(1)(A)–(C).

30.     Knowingly means that the person or entity: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information.  *Id*. § 3729(b)(1).  The person or entity need not have acted with the specific intent to defraud the United States to be liable under the FCA.  *Id*.

### B.     TARP and the Capital Purchase Program

31.     Congress created TARP in response to the financial crisis of 2008.  A purpose of the legislation establishing the program was "to immediately provide authority

and facilities that . . . the Treasury can use to restore liquidity and stability to the financial system of the United States."  Emergency Economic Stabilization Act of 2008 (EESA), Div. A, § 2, 122 Stat. 3765.  EESA authorized Treasury, through TARP, to "purchase, and to make and fund commitments to purchase, troubled assets from any financial institution."

32.     EESA established the Office of Financial Stability (OFS) within Treasury to administer the program.  EESA required OFS to distribute TARP funds in a manner that, among other things, "preserves homeownership and promotes jobs and economic growth [and] maximizes overall returns to the taxpayers of the United States."

33.     The Capital Purchase Program (CPP) is a component of TARP under which Treasury invested capital in financial institutions in exchange for preferred stock or debt securities.  Like TARP, the purpose of CPP was to "to stabilize the financial system by providing capital to viable financial institutions of all sizes throughout the nation."[4]

34.     From late 2008 through 2009, Treasury invested approximately $205 billion of CPP funds in more than 700 financial institutions nationwide.

35.     Participation in CPP was voluntary.  A financial institution wishing to participate submitted an application to its primary federal regulator for a capital investment of a particular amount.  If the application was approved by the regulator and was then approved by Treasury, the applicant entered into an agreement with Treasury in which the financial institution would make numerous representations, warranties, and recitals about, *inter alia*, its financial condition and intentions for the use of the funds.

---

[4]     Treasury Website, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/cap/Pages/default.aspx (June 24, 2015).

36.     The representations contained within the financial institution's TARP application, and, if approved, the representations made in the stock or securities purchase agreement between the financial institution and Treasury, were material to Treasury's decision to invest in the financial institution.  These statements referenced periodic disclosures and reports that the financial institution submits to regulators.  For bank holding companies, such reports are referred to as FR-Y9s and are submitted to the Federal Reserve Board.  For banks, such reports are referred to as Call Reports or Thrift Financial Reports (TFRs) and are submitted to the Office of the Comptroller of the Currency (OCC) or the Federal Deposit Insurance Corporation (FDIC).

37.     In evaluating a TARP application, Treasury balanced the need to provide effective assistance to the troubled financial institution with efficient deployment of taxpayer funds.  To strike that balance, Treasury relied on the veracity of the applicant's representations.

## V.     DEFENDANTS' MADE MATERIALLY FALSE STATEMENTS AND CLAIMS TO TREASURY.

38.     Defendants requested an investment of CPP funds in an application to Treasury dated October 23, 2008 (the TARP Application).  Stuart signed the TARP Application on behalf of One Financial and listed himself as the "Primary Contact."

39.     The TARP Application initially requested a $10 million CPP investment in One Financial, and subsequently, via a May 2009 email, sought an additional $7.3 million; taken together Defendants requested a total of $17.3 million.

40.     Defendants formally presented the claims for CPP funds to Treasury in the SPA, signed by Stuart on behalf One Financial.

41.     Defendants on behalf of One Financial made at least two sets of false statements that were material to the claims for CPP funds and that rendered the claims false.

### A.     The TARP Application

42.     The first set of false statements appeared in the TARP Application.  The TARP Application did not reflect serial frauds perpetrated on the Bank by Stuart and the Senior Executives, which, by October 2008, had significantly depleted the Bank's capital and undermined its financial stability.

43.     First, the TARP Application required Defendants to list the amount of "total risk-weighted assets as reported on the Holding Company's or applicable institution's most recent FR-Y9, Call Report, or TFR, as relevant."  *See* ¶ 36, *supra*. Defendants listed $336,671,000.  That figure materially overstated One Financial's assets as it did not reflect various frauds that Stuart and the Senior Executives had committed against the Bank, One Financial's principal asset.

44.     Second, in the TARP Application, Defendants affirmed that the "institution ha[d] reviewed the investment agreements and related documentation on Treasury's website," which included representations, warranties, and recitals similar to those in the SPA.  One such representation stated: One Financial "has not, individually or in the aggregate, had and would not reasonably be expected to have . . . a material adverse effect on . . . the business, results of operation or financial condition of the Company and any of its subsidiaries taken as a whole."  *Cf.* SPA §§ 2.1(b), 2.2(a).

45.     The TARP Application then required a description of "any condition, including a representation or warranty, contained in the investment agreements and

related documentation" that "the institution believes it cannot comply with."  Defendants

left that portion of the TARP Application blank, representing to Treasury that there was

no condition that would prevent One Financial from complying with the representations

and warranties.

46.     In fact, because of Stuart's frauds on the Bank, Defendants knew that One

Financial could not comply, and indeed, was already not in compliance, with the

representations and warranties.  *See* ¶¶ 56–59, *infra*.

**B.     The Securities Purchase Agreement**

47.     To implement Defendants' requests for CPP funds and their

representations, warranties, and recitals in support of the requests, Defendants and

Treasury executed the SPA on June 5, 2009.  Stuart signed the SPA as Chairman,

President, and Chief Executive Officer of One Financial.

48.     The second set of false statements material to Defendants' false claims for

CPP funds appeared in the SPA.  In Article II of the SPA, Defendants on behalf of One

Financial made specific "Representations and Warranties" to Treasury.  Each of the

following representations and warranties was false when made because it concealed

Defendants' frauds on the Bank, which, by the October 2008, had significantly depleted

the Bank's capital.

49.     In Section 2.2(a) of the SPA, Defendants on behalf of One Financial

falsely represented that One Financial "has not, individually or in the aggregate, had and

would not reasonably be expected to have a Company Material Adverse Effect," defined

in Section 2.1(b) as "a material adverse effect on . . . the business, results of operation or

financial condition of the Company and any of its subsidiaries taken as a whole."

12

50.     In Section 2.2(h) of the SPA, Defendants on behalf of One Financial falsely represented that One Financial's previously disclosed financial reports "present fairly in all material respects the consolidated financial position of the Company and its consolidated subsidiaries as of the dates indicated therein and the consolidated results of their operations for the periods specified therein."

51.     In Section 2.2(i)(ii)(B)(y) of the SPA, Defendants on behalf of One Financial falsely represented that One Financial "has disclosed . . . to the Company's outside auditors and the audit committee of the Board of Directors . . . any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting."

52.     In addition to these false representations and warranties, in the Recitals to the SPA, Defendants on behalf of One Financial promised to use the CPP investment "to expand the flow of credit to U.S. consumers and businesses on competitive terms to promote the sustained growth and vitality of the U.S. economy."  Rather than fulfilling that obligation, Stuart immediately diverted a portion of the CPP funds for his personal purposes.  *See* ¶¶ 60–64, *infra*.

53.     Relying on the veracity of the statements in the TARP Application and SPA, and in the financial disclosures and reports that they referenced, Treasury approved Defendants' claims for a $17.3 million CPP investment in One Financial.

54.     Treasury wired the funds to One Financial on June 5, 2009.

## VI.     DEFENDANTS' KNEW THAT THEIR STATEMENTS AND CLAIMS TO TREASURY WERE FALSE.

55.     Defendants knew that the statements they made on behalf of One Financial in support of their claims for CPP funds were false.  For years before

Defendants submitted the TARP Application, signed the SPA, or received the CPP investment, Stuart and the Senior Executives had been engaged in multifarious frauds against the Bank.  The frauds predating and immediately following One Financial' s receipt of CPP funds establish Defendants' knowledge of the falsity of the representations that they made to secure those funds.

56.     Like those that followed the CPP investment, the pre-investment schemes involved Stuart's diversions of Bank assets for personal use, and often subsequent concealment of the transactions, either by not recording them, or by falsely recording them as legitimate Bank expenses.  By way of example only:

a.     In 2007, the Bank purchased a condominium in Dallas, Texas.  In September 2008, the Bank sold the condominium for a gross sales price of $850,000, with net proceeds of $765,130 due to the Bank.  A check dated September 5, 2008, was issued by the closing company and made payable to the Bank.  On September 8, 2008, the check was diverted from the Bank and deposited directly into Stuart's personal checking account.

b.     In January 2008, using Bank funds, Stuart purchased a 2008 Cadillac Escalade for his wife.  Stuart completed the purchase with a bank cashier's check for $60,129.  Senior Executive Whitehead approved the cashier's check and authorized the amount to be withdrawn from the Bank's general operating account rather than a personal account of Stuart.  In addition to utilizing the anonymity of the cashier's check, Stuart and Senior Executive Whitehead concealed the personal nature of the transaction when Whitehead prepared a

General Ledger entry ticket for the amount of the cashier's check to be included in the Bank's "Advance Payment to Vendor" account.

c.      In March 2009, Stuart and other Senior Executives engaged in a scheme to purchase a house for Stuart's son, Hunter, in Little Rock, Arkansas, with a mortgage originated by the Bank.  The loan and mortgage documents falsely stated that Hunter had a sufficient employment history with the Bank, sufficient income from the Bank, and sufficient funds in his checking account to quality for the loan.  To fund the closing, Stuart instructed Senior Executive Whitehead to obtain two cashier's checks totaling $96,897.06.  The cashier's checks were funded with a withdrawal from the Bank's operating account rather than a personal account of Stuart or his son.  In addition to utilizing the anonymity of the cashier's checks, Stuart and Whitehead concealed the personal nature of the transaction when Whitehead prepared and submitted a General Ledger entry ticket for the amount of the cashier's checks to be included in the Bank's "Advanced Payments to Vendors" account.

d.      In October 2008—the month Defendants' initiated their request for TARP funds—Stuart and Senior Executive Whitehead caused the Bank to issue six cashier's checks totaling $1,025,323.89 payable to the United States and the State of Arkansas for back taxes personally owed by Stuart.  The funds for the cashier's checks were not drawn from any of Stuart's personal accounts, but from the Bank's general operating funds.  The general ledger entries for the transactions indicated that the expenditures were associated with a Bank asset account known as "Interdepartmental Account," which was designed to move

money between departments and Bank branches, and to advance cash to customers with Bank credit cards.

e.      Between December 2007 and September 2012, Stuart conspired with Senior Executives Richenback, Heald, Whitehead, and Paul to avoid taking a loss on a $1.5 million line of credit to a Bank customer that had not been repaid. The conspirators authorized a second line of credit from One Financial to another Bank customer to be used to repay the Bank for the overdue loan.  The conspirators concealed the transactions from regulators and intentionally omitted them from Bank financial statements.  In particular, Bank Call Reports for the third and fourth quarters of 2008 did not disclose the past due status of the $1.5 million loan or the transactions undertaken to avoid recognizing the loss.  One of the conspirators later informed the Bank's Board of Directors that Stuart participated in the scheme, and that the purpose of the transactions was to "prevent the Bank from having to recognize a loss on this . . . loan in January 2009."

57.     Given Stuart's participation in these frauds, Defendants knew that the statements in the TARP application; the representations, warranties, and recitals in the SPA; and the financial reports that both referenced, *see* ¶¶ 43, 50 *supra*, were false.

58.     When Defendants on behalf of One Financial represented to Treasury, for example, that One Financial "would not reasonably be expected to have . . . a material adverse effect on . . . the business, results of operation or financial condition of the Company," Defendants knew that they had, *inter alia*: (a) diverted a $765,130 check made payable to the Bank into Stuart's personal checking account; (b) used Bank funds

to purchase a Cadillac for Stuart's wife; (c) caused the Bank to issue cashier's checks

funded by the Bank's operating account to close on a home for Stuart's son; and, (d)

caused the Bank to issue cashier's checks funded by the Bank's operating account to pay

Stuart's overdue taxes.  *See* ¶ 56(a)–(d), *supra*.

59.     Likewise, when Defendants on behalf of One Financial represented to

Treasury that previously disclosed financial reports "present fairly in all material respects

the consolidated financial position of the Company and its consolidated subsidiaries as of

the dates indicated therein and the consolidated results of their operations for the periods

specified therein," Defendants knew that they had conspired to avoid recording a $1.5

million loss associated with a defaulted line of credit to a Bank customer.  *See* ¶ 56(e),

*supra*.

## VII.     DEFENDANTS' CONTINUED FRAUD, INCLUDING THEIR IMMEDIATE DIVERSION OF A PORTION OF THE TARP INVESTMENT, COMMINGLED TARP FUNDS WITH ASSETS TAINTED BY FRAUD AND COMPROMISED THE PURPOSE OF THE INVESTMENT.

60.     Defendants began diverting the CPP investment for personal use on the

very day One Financial received the $17.3 million.

61.      On June 5, 2009, One Financial received a $17.3 million wire transfer

from Treasury, which was deposited into a checking account at the Bank.  The balance of

the account just prior to the deposit was $55,741.63.

62.     The same day, check number 1101 from the same account was made

payable to "Rivercity," a company owned entirely by Stuart, in the amount of

$696,286.11.  The check was deposited into an account maintained by Stuart and

Rivercity at the Bank.

63.     Two weeks later, check number 1102 from the same account was made personally payable to Stuart in the amount of $1,505,254.87.  The check was deposited into an account maintained by Stuart at the Bank.

64.     Thus, within two weeks of receiving the CPP investment, Stuart had diverted over $2.1 million of TARP funds for his personal use.  On information and belief, the remainder of the investment was held in a Bank operating account and commingled with other Bank assets, which Stuart continued to divert.

65.     Indeed, Stuart's frauds, and those of the Senior Executives, continued for years thereafter, causing further misuse of the TARP money and dilution the CPP investment.

66.     The continuing frauds also severely undermined the purpose of the CPP investment.  By way of example only:

a.      Stuart, acting on behalf of the Bank, entered into a contract to borrow money against the cash surrender value of Bank-owned life insurance policies from Northwestern Mutual and Pacific Life Insurance Companies.  The policies were initiated by Senior Executive Heald and other Bank officers after Stuart failed to create an employee stock ownership program for them.  The policies were the primary assets of the Bank officers' retirement plan, and the premiums were paid by the Bank.  On June 30, 2011, Stuart borrowed $7,784,502 against the policies.  The $7,784,502 arrived in the form of two checks made payable to the Bank, which Stuart diverted into his Rivercity account.

b.      In December 2011, two checks were made payable to a construction company for renovations to the Bank's suites at the Verizon Center

in Little Rock.  In July 2012, Senior Executive Whitehead presented an OCC

employee with invoices to corroborate the construction costs.  No improvement

projects related to the luxury suites were ever commenced, however, much less

completed.  Instead, the checks were deposited into an account at the Bank and

used to purchase two cashier's checks for a total of approximately $377,132.  The

cashier's checks were used to make payments on Stuart's personal credit cards.

       c.        Between 2001 and 2013, the Bank made payments of over $1.75

million to various companies for air travel.  Stuart attempted to conceal the

personal nature of the expenditures by posting the payments to various

unassociated general ledger accounts, including "Furniture & Fixtures,"

"Equipment Maintenance Contracts," and "Prepaid Other."  The flight manifests

indicate that between June 2011 and April 2013, at least 282 flights were paid for

by the Bank but used exclusively by Stuart and his family and friends.

       d.        In August 2011, Stuart and other senior Bank officials engaged in a

scheme to purchase a house for Stuart's daughter, Kirby, in Little Rock, Arkansas,

with a mortgage originated by the Bank.  The loan and mortgage documents

falsely stated that Kirby had a sufficient employment history with the Bank,

sufficient income from the Bank, and sufficient funds in her checking account to

quality for the loan.  To fund the closing, Stuart instructed Senior Executive

Whitehead to obtain a cashier's check payable to the title company in the amount

of $53,307.47.  The cashier's checks was funded by Stuart's Rivercity account,

which contained funds diverted from the Bank.

e.      In May 2012, using Bank funds, Stuart purchased a 2013 Land Rover for his son.  Stuart completed the purchase with a Bank cashier's check in the amount of $67,093.  In addition to utilizing the anonymity of the cashier's check, Stuart and Senior Executive Whitehead concealed the personal nature of the transaction when Whitehead prepared a General Ledger entry ticket for the amount of the cashier's check to be included in the Bank's "Other Assets" account rather than a personal account of Stuart.

f.      In June 2012, using Bank funds, Stuart purchased a 2013 Lexus for his daughter.  Stuart completed the purchase with a Bank cashier's check in the amount of $42,268.85.  In addition to utilizing the anonymity of the cashier's check, Stuart and Senior Executive Whitehead concealed the personal nature of the transaction when Whitehead prepared a General Ledger entry ticket for the amount of the cashier's check to be included in the Bank's "Other Assets" account rather than a personal account of Stuart.

67.     The Bank recently estimated that it incurred over $17 million in losses as a result of these and other frauds perpetrated by Stuart and the Senior Executives.  *See* Verified Claim of One Bank & Trust, N.A. ¶ 6, *Matter of the Estate of Layton P. Stuart*, No. 60PR-13-1179 (Ark. Cir. Ct., Pulaski Cnty.).

68.     But for Defendants' misrepresentations and omissions of material facts, Treasury would not have invested in One Financial.  Specifically, had Treasury known the true financial condition of the Bank, or that Stuart would immediately divert over $2.1 million of the TARP investment for his personal use and continue to defraud the Bank after the date of the investment, Treasury would not have invested in One Financial.

Accordingly, the United States is entitled to recover the entire amount of Treasury's $17.3 million investment plus treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1), as well as interest and costs.

## VIII.   CAUSES OF ACTION

### Count I: False or Fraudulent Claims

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1) (1986))

69.     The United States repeats and re-alleges paragraphs 1–68 as if fully set forth herein.

70.     Defendants on behalf of One Financial knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval of a $17.3 million investment of CPP funds by Treasury, in violation of the FCA, 31 U.S.C. § 3729(a)(1) (1986), amended by 31 U.S.C. § 3729 (a)(1)(A) (2009).

71.     The false or fraudulent claims were contained in the TARP application, the email revising the TARP application, and the SPA.

72.     Because of Defendants' false or fraudulent claims, the United States suffered damages.

73.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

### Count II: False Statements

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

74.     The United States repeats and re-alleges paragraphs 1–68 as if fully set

forth herein.

75.     Defendants on behalf of One Financial knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims for a $17.3 million investment of CPP funds by Treasury, in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(B).

76.     The false records or statements were made in the TARP application, the email revising the TARP application, the SPA, and the financial disclosures and reports that the application and SPA referenced.

77.     The false records or statements were material to Defendants' claims for CPP funds because Treasury would not have made the CPP investment absent the records or statements.

78.     Because of Defendants' false or fraudulent records or statements, the United States suffered damages.

79.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## Count III: Conspiracy

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### (formerly 31 U.S.C. § 3729(a)(3) (1986))

80.     The United States repeats and re-alleges paragraphs 1–68 as if fully set forth herein.

81.     Defendants conspired to commit the violations described in Counts I and II, *supra*.

82.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## Count IV: Fraud

83.     The United States repeats and re-alleges paragraphs 1–68 as if fully set forth herein.

84.     Defendants on behalf of One Financial knowingly made false representations of fact that were material to Treasury's decision to invest $17.3 million of CPP funds in One Financial.

85.     Defendants intended for their false representations of fact to induce Treasury to invest $17.3 million of CPP funds in One Financial.

86.     Treasury justifiably relied on Defendants' false representations of fact.

87.     Because of Treasury's justifiable reliance on Defendants' false representations of fact, the United States suffered damages, in an amount to be determined at trial, for which Defendants are liable.

## Count V: Payment under Mistake of Fact

88.     The United States repeats and re-alleges paragraphs 1–68 as if fully set forth herein.

89.     The United States made the $17.3 million CPP investment described in this Complaint as a result of mistaken understandings of fact.  Specifically, the United States made the investment under the mistaken understanding that Defendants' statements to Treasury and reports to regulators on behalf of One Financial accurately

described One Financial's financial condition and intentions for the use of the CPP investment.

90.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants, paid Defendants on behalf of One Financial certain sums of money to which Defendants were not entitled.  Defendants are thus liable to make restitution to the United States for such amounts, which are to be determined at trial.

## Count VI: Unjust Enrichment

91.     The United States repeats and re-alleges paragraphs 1–68 as if fully set forth herein.

92.     The United States made a $17.3 million CPP investment in One Financial that it would not have made had it known the truth of Defendants' frauds and One Financial's financial condition.  By directly or indirectly obtaining federal funds from Treasury to which they were not entitled, Defendants on behalf of One Financial were unjustly enriched at the expense of the United States, and are liable to account and pay to the United States such amounts, or the proceeds therefrom, which are to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

I.     On Counts I, II, and III, against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

24

II.     On Count IV for fraud, against all Defendants jointly and severally, for an amount equal to the money paid by the United States to Defendants because of Treasury's justifiable reliance on Defendants' false representations of fact, plus interest, costs, and expenses.

III.    On Count V for payment under mistake of fact, against all Defendants jointly and severally, for an amount equal to the money paid by the United States to Defendants to which Defendants were not entitled, plus interest, costs, and expenses.

IV.     On Count VI for unjust enrichment, against all Defendants jointly and severally, for the damages sustained and/or amounts by which Defendants retained monies received from reimbursements paid by the United States to which Defendants were not entitled, plus interest, costs, and expenses.

V.      All other relief as may be required or authorized by law and in the interests of justice.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury trial in this case.


Dated: July 1, 2015                          Respectfully submitted,

                                             Benjamin C. Mizer
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             Vincent H. Cohen, Jr.
                                             United States Attorney
                                             District of Columbia

                                             Daniel F. Van Horn
                                             Chief, Civil Division

By: /s/ Beverly M. Russell

Beverly M. Russell
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC  20530
Telephone: (202) 252–7566

Michael D. Granston
Jamie A Yavelberg
Adam R. Tarosky
Civil Division
Commercial Litigation Branch

P.O. Box 261
Ben Franklin Station
Washington, DC  20044
Telephone: (202) 307–0404
Facsimile: (202) 307–3852

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Complaint of the

United States was served on July 1, 2015, via Federal Express, upon the following:

Christopher O. Parker
Charles D. McDaniel
Eichenbaum Liles, P.A.
124 West Capitol Avenue, Suite 1900
Little Rock, AR 72201

*Counsel for the Estate, Trusts, and Richard A. Torti, Sr.*

Glen G. Reid
Wyatt Tarrant & Combs LLP
1715 Aaron Brenner Drive
Suite 800
Memphis, TN  38120

*Counsel for Tommye, Hunter, and Kirby Stuart*


   /s/ Beverly M. Russell
Beverly M. Russell